IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

THE CONSORTIUM FOR )
INDEPENDENT JOURNALISM, INC. )
    t/a Consortiumnews.com )
)
    Plaintiff, )
)
v. ) Case 1:20-cv-01205-AJT-TCB
)
)
GLOBAL NEWS, a division of )
Corus Entertainment, Inc. )
)
    Defendant. )
)

# MEMORANDUM IN OPPOSITION
# TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, The Consortium for Independent Journalism, Inc. t/a Consortium News ("Plaintiff"), by counsel, pursuant to Local Civil Rule 7(F) respectfully submits this Memorandum in Opposition to the motion to dismiss [*ECF No. 9*] filed by defendant, Global News, a division of Corus Entertainment, Inc. ("Defendant").

## I. INTRODUCTION

"Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 170 (1967) (Warren, C.J., Concurring). The press has no "special immunity from the application of general laws", nor does it have a "special privilege to invade the rights and liberties of others." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972). The press has no right to "invent

1

facts" or to "comment on the facts so invented" and, thereby, convince readers that the invented facts are true. Simply put:

> "[l]iberty of the press is not license, and newspapers have no privilege to publish falsehoods or to defame under the guise of giving the news. It is held that the press occupies no better position than private persons publishing the same matter; that it is subject to the law, and if it defames it must answer for it."

*Williams Printing Co. v. Saunders*, 113 Va. 156, 73 S.E. 472, 477 (1912) (numerous citations and quotations omitted); *Dexter v. Spear*, 7 F. Cas. 624-625 (1st Cir. 1825) (Story, J.) ("No man has a right to state of another that which is false and injurious to him. A fortiori no man has a right to give it a wider and more mischievous range by publishing it in a newspaper. The liberty of speech, or of the press, has nothing to do with this subject. They are not endangered by the punishment of libellous publications. The liberty of speech and the liberty of the press do not authorize malicious and injurious defamation. There can be no right in printers, any more than in other persons, to do wrong.").

One who slanders on television and publishes libel on the Internet, like Defendant did in this case, knowing that it circulates among many people, "thereby places it in permanent form where it will be more likely to continue in existence and to be read by many people, and where he causes it to be published in a newspaper or magazine he thereby evidences his intention that the readers shall read it". *James v. Powell*, 154 Va. 96, 113-114, 152 S.E 539 (1930) (quoting *Maytag v. Cummins*, 260 F. 74, 80 (8th Cir. 1919)). In *Fuller v. Edwards*, the Virginia Supreme Court recognized that "[o]ne's right to an unimpaired limb and to an unimpaired reputation are, in each instance, absolute and has been since common law governed England. Indeed, an impaired reputation is at times more disastrous than a broken leg." 180 Va. 191, 198, 22 S.E.2d 26 (1942) (cited in

*Gazette, Inc. v. Harris*, 229 Va. 1, 7, 325 S.E.2d 713 (1985) ("In Virginia, as in other states, the law of defamation historically has protected a basic interest. The individual's right to personal security includ[ing] his uninterrupted entitlement to enjoyment of his reputation.")); *Jordan v. Kollman*, 269 Va. 569, 575, 612 S.E.2d 203 (1005) (same); *id. Rosenblatt v. Baer*, 383 U.S. 75, 92-93 (1966) ("'Society has a pervasive and strong interest in preventing and redressing attacks upon reputation.' The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty … Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whole society.").

Plaintiff is an independent consortium of journalists headquartered in Arlington, Virginia. Defendant is a global news organization. This is an action for defamation and civil conspiracy. The case arises out of Defendant's needless and palpably false attacks on Plaintiff in a television broadcast, internet and social media blitzkrieg that occurred in December 2019. [*ECF No. 1 ("Compl., ¶ 2*]. In its complaint, Plaintiff alleges that the Defendant published multiple false and defamatory statements with actual knowledge that the statements were false that caused substantial damage to Plaintiff's hard-earned and untarnished reputation in Virginia. [*Id., ¶¶ 1, 2, 4, 6, 17, 18, 19, 20, 24, 25*]. Plaintiff asserts that Defendant is at home in Virginia, and is subject to general and specific personal jurisdiction in Virginia. [*Id., ¶¶ 7, 9*]. On January 26, 2021, Defendant filed a motion to dismiss pursuant to Rule 12(b)(2) asserting that it is not subject to personal jurisdiction for the harm caused to Plaintiff. [*ECF No. 9*].

The matter is before the Court on Defendant's motion to dismiss. For the reasons stated below, Defendant's motion should be denied.

## II. BACKGROUND

Plaintiff is a Virginia corporation, headquartered in Arlington. Plaintiff publishes "Consortium News" ("CN"), an Internet-based investigative news magazine. CN's editor-in-chief, Joe Lauria ("Lauria"), is a veteran journalist with decades of experience in some of the most powerful media establishments. Lauria lives in Alexandria, Virginia. CN features the work of independent journalists, academics, freelance writers, and former intelligence agency professionals in Virginia and elsewhere in the United States and around the world. CN's writers, editors, producers and board of directors have been on the forefront of investigative journalism for decades. Plaintiff has no ties with Russia. Until it was tarnished by Defendant's publications, CN enjoyed an excellent reputation. Defendant is an international news and social media conglomerate that broadcasts, publishes and sells its content in more than 160 countries across the world. Defendant broadcasts news reports and operates an online, digital platform, www.globalnews.ca. Defendant employs 200 journalists working in 13 newsrooms to provide content about issues in Canada, the United States, and abroad. Defendant maintains a Washington, D.C. bureau and agents who live and work in Washington, D.C., including bureau chief Jackson Proskow. [https://twitter.com/jproskowglobal?lang=en]. Defendant routinely reports on and publishes articles about matters unique to Virginia. [*See, e.g.,* https://globalnews.ca/tag/virginia/]. Indeed, Defendant advertises and represents that "GlobalNews.ca [is] your source for the latest news on Virginia." [*Compl., ¶¶ 1, 6, 7*].

Plaintiff alleges in its complaint that on December 10, 2019, Defendant targeted Plaintiff as part of a broad, international disinformation campaign by Canadian Deputy Prime Minister (and former Foreign Minister) Chrystia Freeland ("Freeland") and other powerful interests within the Canadian Government to link their critics to "Russia" as a way of discrediting those critics and protecting themselves. Acting in concert with others [*Compl., ¶¶ 16, 17, 25(b), 29*], Defendant broadcast and republished[1] false and defamatory statements about Plaintiff that were watched and read by millions in Virginia and elsewhere. As part of its reporting, Defendant reviewed Plaintiff's website (published in Virginia), and took selective screenshots that Defendant then used as part of the preconceived disinformation campaign against Plaintiff. [*Id., ¶ 25(a) fn. 4*]. Plaintiff contends that the general thrust and content of Defendant's television broadcasts, online

---

[1] *Reuber v. Good Chemical News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991) ("one who repeats a defamatory statement is as liable as the original defamer."), *cert. denied*, 111 S. Ct. 2814 (1991) (citing *Lee v. Dong-A Ilbo*, 849 F.2d 876, 878 (4th Cir. 1988)); *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1298-1299 (D.C. Cir. 1988) ("The common law of libel has long held that one who republishes a defamatory statement 'adopts' it as his own, and is liable in equal measure to the original defamer") (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* 799 (5th ed. 1984) ("Every repetition of the defamation is a publication in itself, even though the repeater states the source ... or makes clear that he himself does not believe the imputation.") (footnotes omitted), *cert. denied*, 488 U.S. 825 (1988); *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60-61 (2nd Cir. 1980) (discussing the "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement.") (quotation marks and citation omitted); *Watson v. NY Doe 1*, 439 F.Supp.3d 152, 161 (S.D.N.Y. 2020) ("[a] speaker who repeats another's defamatory statements is not made immune from liability for defamation merely because another person previously made the same demeaning claim.") (quoting *Enigma Software Group USA, LLC v. Bleeping Computer, LLC*, 194 F.Supp.3d 263, 287 (S.D.N.Y. 2016) (collecting cases)); *Butowsky v. Folkenflik*, 2019 WL 2518833, at * 13 (E.D. Tex. 2019) ("It is a well-settled legal principle that one is liable for republishing the defamatory statement of another.") (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973) (a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own")).

article and tweets – which Defendant wrote, produced, directed, spoke in, edited and published on multiple platforms that it operated – manifests an intent to target and focus on Plaintiff and direct content to a Virginia audience. Indeed, as the complaint establishes, the focal point of Defendant's defamatory narrative is an article published in Virginia by Plaintiff in February 2017. [*Compl*, ¶¶ *2, 4, 12, 15*]. The brunt of the harm, in terms of both of the injury to Plaintiff's business and reputation, was suffered in Virginia, where Plaintiff is headquartered and where it publishes. Plaintiff claims that its injuries directly arise from and relate to Defendant's publication of false and defamatory statements in Virginia. [*Id.*, ¶¶ *2, 3, 4, 9*].

### III. DISCUSSION

**A.** *Defendant Is Subject To Personal Jurisdiction In Virginia*

When, as here, "the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016); *id. Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009); *Gilmore v. Jones*, 370 F.Supp.3d 630, 650 (W.D Va. 2019) (quoting *Universal Leather, LLC v. Koro AR, SA*, 773 F.3d 553, 558 (4th Cir. 2014)). In reviewing the matter, the Court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction. *New Wellington Fin. Corp. v. Flagship Resort Dev. Co.*, 416 F.3d 290, 294 (4th Cir. 2005) (citations and quotations omitted); *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). "If a plaintiff makes the

requisite showing, the defendant then bears the burden of presenting a 'compelling case,' that, for other reasons, the exercise of jurisdiction would be so unfair as to violate due process." *Reynolds Foil, Inc. v. Pai*, 2010 WL 1225620, at * 1 (E.D. Va. 2010) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477-78 (1985)).

For a Court to "assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). "Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of due process, the two-prong test collapses into a single inquiry when Virginia is the forum state." *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 301 (4th Cir. 2012). "A Virginia court thus has jurisdiction over a nonresident defendant if the exercise of such jurisdiction is consonant with the strictures of due process." *Id.* "A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in the state 'does not offend the traditional notions of fair play and substantial justice.'" *Carefirst*, 334 F.3d at 397 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The requirements of the Due Process clause can be met through establishing either general or specific jurisdiction. *See, e.g., Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-415 (1984); *CFA Inst. v. Inst. Of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 fn. 15 (4th Cir. 2009).

Construing Plaintiff's allegations in the light most favorably to it and drawing the most favorable inferences for the existence of jurisdiction, there is no question that Plaintiff has made a prima facie showing as to both general and specific personal jurisdiction.

1. *<u>General Jurisdiction</u>*

General jurisdiction exists whenever a "foreign" corporation (sister-state or foreign-country) engages in "continuous and systematic general business contacts" with the forum State. *Witt v. Reynolds Metals Co.*, 240 Va. 452, 454-455, 397 S.E.2d 873 (1990) (citing *International Shoe Company v. Washington*, 326 U.S. 310, 318 (1945) (general jurisdiction exists where a foreign corporation's "continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.")); *id. Hall*, 466 U.S. at 416 (the pertinent question is whether defendant had "continuous and systematic general business contacts" with the forum state); *Bay Tobacco, LLC v. Bell Quality Tobacco Products, LLC*, 261 F.Supp.2d 483, 497 (E.D. Va. 2003) ("this Court must determine whether it may exercise general jurisdiction over Bell and Continental, meaning Bay must prove that each defendant has fairly extensive, continuous, and systematic contacts with Virginia").[2]

---

[2] In *Bay Tobacco*, the Court found that the defendant "transacted a fair amount of business in Virginia and derived substantial revenue therefrom. What the Court knows about Continental's contact with Virginia is that, over a period of time, Continental shipped its product directly into the Commonwealth anticipating that it would be sold to Virginia consumers. Thus, it appears that Continental purposefully directed its business activities toward Virginia and could reasonably expect that it might be subject to jurisdiction in the Commonwealth. The Court finds that it does not offend the due process protections of the Constitution to exercise personal jurisdiction over Continental. 261 F.Supp.2d at 497-498.

Since *International Shoe* and *Hall*, the United States Supreme Court has explained that, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cited in *Daimler A.G. v. Bauman*, 571 U.S. 117, 127 (2014)). There is no single formula, exclusive affiliation or set of circumstances that establishes when a corporation is "essentially at home" in a given State. The place of incorporation and principal place of business are "paradig[m]"[3] places where a corporation is "essentially at home", *Daimler*, 571 U.S. at 137, **but**, as the Virginia Supreme Court held in *Witt v. Reynolds Metal Co.*, a foreign corporation may be "essentially at home" in Virginia if it has a "significant presence" in Virginia, *i.e.*, if it is "present in the forum" and "engaging in substantial, on-going business". 240 Va. at 454-456, 397 S.E.2d at 875-876 ("A foreign corporation, then, which has its principal place of business in the forum, or otherwise engages in a persistent course of systematic and substantial business activities in the forum state may be subjected to personal jurisdiction there … We find that the requirements of the due process clause are not violated by subjecting Reynolds to personal jurisdiction in the Circuit Court of Henry County on a cause of action arising out of events unrelated to the business conducted in the Commonwealth.").

The Defendant in this action is engaged in persistent, systematic and substantial business activity in Virginia. [*Compl., ¶ 7, 9*]. Defendant broadcasts content to viewers in Virginia. Defendant operates a digital platform that repeatedly publishes information

---

[3] "Paradigm" means a typical example or pattern of something: a framework. [https://www.merriam-webster.com/dictionary/paradigm].

into Virginia. Defendant's cadre of journalists routinely report on and publish articles about matters unique to Virginia. Indeed, Defendant advertises and represents that "GlobalNews.ca [is] your source for the latest news on Virginia." Defendant operates in Virginia and is, therefore, subject to suit here.[4] *See Daimler*, 571 U.S. at 151 (Sotomayor, J., Concurring) ("When a corporation chooses to invoke the benefits and protections of a State in which it operates, the State acquires the authority to subject the company to suit in its courts."); *International Shoe*, 326 U.S. at 319 ("[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state" such that an "obligatio[n] arise[s]" to respond there to suit). Justice Sotomayor's observations in *Daimler* bear repeating:

> "What has changed since *International Shoe* is not the due process principle of fundamental fairness but rather the nature of the global economy. Just as it was fair to say in the 1940's that an out-of-state company could enjoy the benefits of a forum State enough to make it 'essentially at home' in the State, it is fair to say today that a multinational conglomerate can enjoy such extensive benefits in multiple forum States that it is 'essentially at home' in each one."

571 U.S. at 156.

Viewing Plaintiff's allegations in the light most favorable, Defendant's contacts with Virginia are extensive, systematic and continuous. Defendant is subject to general jurisdiction.

---

[4] The number and identity of Defendant's Virginia partners, vendors, subscribers, viewers, subscribers and social media followers, the specific nature and frequency of its business contacts with the Commonwealth, including the identity of its reporters who have been physically present in Virginia in the past three (3) years, and the amount of revenue it receives from Virginia-based advertising, programming and sales is unknown to Plaintiff without discovery. Defendant refuses to provide jurisdictional discovery.

## 2. *Specific Personal Jurisdiction*

In order for a State court to exercise specific jurisdiction, "the suit" must "aris[e] out of or relat[e] to[5] the defendant's contacts with the forum". *Daimler*, 571 U.S. at 127 (quoting *Hall*, 466 U.S. at 414 fn. 8)); *Burger King*, 471 U.S. at 472-473. In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919. In assessing specific jurisdiction, Courts employ a three-part test to determine whether the exercise of specific jurisdiction over a nonresident defendant comports with the requirements of due process. Courts evaluate: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp.*, 561 F.3d at 278 (quoted in *UMG Recordings v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020)).

In deciding whether it can exercise specific personal jurisdiction over a defendant, "a court must weigh the totality of the facts before it." *Perdue Food, LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016). The Court "should not merely … count [a defendant's] contacts [with the forum state] and quantitatively compare this case to other preceding cases." *Carefirst*, 334 F.3d at 397. "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of fair play and substantial justice is not thereby offended." *Id.* The

---

[5] A claim "relates to" a defendant's forum conduct if it has a "connect[ion] with" that conduct. *International Shoe*, 326 U.S. at 319.

"primary concern" is "the burden on the defendant." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

In *Calder v. Jones*, 465 U.S. 783, 788-789 (1984), the United States Supreme Court held that a California court could exercise personal jurisdiction over two Florida newspapermen in a libel action arising out of a *National Inquirer* article written in Florida but "concern[ing] the California activities" of Shirley Jones, a Hollywood actress and California resident. The Court noted that the "article was drawn from California sources, and the brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* Because "California [was] the focal point both of the story and of the harm suffered," jurisdiction was "proper in California based on the 'effects' of [defendants'] Florida conduct in California." *Id.* at 789. The Fourth Circuit has utilized the *Calder* "effects" test in cases involving online activity in two important decisions. In *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002), the Fourth Circuit held that "a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." In *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002), the Fourth Circuit refined the *ALS Scan* test for cases where "the Internet activity" at issue involves "the posting of news articles on a website." In *Young*, the Court of Appeals held that the *ALS Scan* test "works more smoothly when parts one and two" are "considered together," such that courts ask "whether the [defendants] manifested an intent to direct their website content

... to a Virginia audience." *Id.* The fact that a defendant's website can "be accessed anywhere, including Virginia, does not by itself demonstrate that the [defendant was] intentionally directing their website content to a Virginia audience." *Id.* "Something more than posting and accessibility is needed"—the "general thrust and content" of the online publications must "manifest an intent to target and focus on Virginia readers." *Id.* Most recently, the Fourth Circuit held that the defendant's contacts with Virginia were sufficient to establish specific personal jurisdiction, where the defendant operated a website that was globally accessible and was "interactive to a degree", Virginians visited the website, and accessed the website and downloaded information. *Kurbanov*, 963 F.3d at 353-354.

Here, Plaintiff easily makes a prima facie showing of specific personal jurisdiction. The Defendant's broadcasts, its online article (published on a fully accessible and interactive website), its tweets and its YouTube video targeted a Virginia news publisher. The focal point of Defendants' false statements is a Virginia event (Plaintiff's February 2017 article about Chrystia Freeland published in Virginia) and a Virginia citizen (Plaintiff). *Compare Gilmore*, 370 F.Supp.3d at 655 ("the 'focal point' of Creighton's publications was a Virginia event and citizen, making his publications of particular interest to a Virginia audience."). Defendant reached into Virginia to report the fake news story, grabbing a selective screenshot of Plaintiff's website, publishing that screenshot, mentioning Plaintiff by name, and publishing multiple sensational and scandalous statements about Plaintiff in particular, including that Plaintiff is "linked" to Russia; that Russia "directed" Plaintiff's publication of the February 2017 article about Freeland (published in Virginia); that Plaintiff "pushed" the false pro-Russia "narrative";

that Plaintiff participated in the cyber "attack from Russia" on the reputation of Canada's Minister of Foreign Affairs; and that Plaintiff "distorted facts" and intended to "damage … a Canadian leader". [*Compl., ¶¶ 2, 4*]. From its review of Plaintiff's website, Defendant knew that CN was a Virginia-based publication.[6] Because of the excessive publication of the false and defamatory statements – on television, online **_and_** via social media (including Twitter and YouTube)[7] – Defendant knew or should have that its inflammatory statements would reach Plaintiff's contributing journalists, subscribers, advertisers, readers and social media followers in Virginia, causing substantial harm in Virginia.[8] *Compare, e.g., Blue Ridge Bank, Inc. v. Veribanc*, 755 F.2d 371, 374 (4th Cir. 1985) (the defendant "obviously knew that Dorfman was going to write an article that included the allegedly libelous information about Blue Ridge and that the article could find its way into the Commonwealth of Virginia. By requiring Dorfman to reveal his source of financial information Veribanc obviously expected to receive additional orders from customers who read the information in the article. Because of this expectation Veribanc could reasonably expect to be hailed into court, on an allegation of false information supplied to Dorfman by Veribanc, in any forum in which Dorfman's article appeared … Veribanc's fifty-seven contacts with its subscribers in Virginia add strength to the exercise of personal jurisdiction over Veribanc"); *Gubarev v. BuzzFeed*, 253 F.Supp.3d 1149, 1159 (S.D. Fla. 2017) ("When Defendants published their unverified

---

[6] A cursory review of Plaintiff's website reveals that Plaintiff's business is located on Wilson Blvd in Arlington, Virginia. [*See* https://consortiumnews.com/about/; https://consortiumnews.com/2011/12/29/contact-us-form/].

[7] Defendant has 568,000 followers on Twitter and 2,330,000 subscribers to its YouTube channel. [*See Compl., ¶¶ 4, 20*].

[8] Plaintiff has a Twitter homepage called "Consortium News", which has 30,300 followers. [https://twitter.com/Consortiumnews].

14

Dossier via their website and mobile application, Defendants knew it would be viewed around the world, and given the international scope of its contents, should have anticipated that the effects of the publication might be felt in different fora, including the fora where Plaintiffs are located. Accordingly, Defendants cannot claim surprise at being haled into court in the Southern District of Florida.").

Litigating this case in Virginia will not impose any burden on Defendant. And, it is beyond dispute that the Commonwealth of Virginia – Plaintiff's home forum – has a significant interest in exercising jurisdiction over those who commit torts (defamation) within its territory. *See, e.g., Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) ("it is beyond dispute that New Hampshire has a significant interest in redressing injuries that actually occur within the State … New Hampshire may rightly employ its libel laws to discourage the deception of its citizens."). Lastly, litigating the case in Virginia will ensure that the dispute is resolved in a fair and efficient way in a legal forum chosen by Plaintiff and a business forum (Virginia) regularly utilized by Defendant. The exercise of specific personal jurisdiction over Defendant is constitutionally reasonable.

## CONCLUSION

Defendant, an international media conglomerate, broadcast on television *and* published an article on its website accessible worldwide *and* used Twitter *and* used YouTube (to access 2.33 million subscribers) to target Plaintiff and ensure that the false statements about Plaintiff caused as much harm as possible to this independent news publisher. The false statements about Plaintiff were not "mentioned in passing". They are not "fleeting references". Plaintiff is at the heart of this fake news story. Even if the issues surrounding Freeland's father's history was an "internal Canadian affair" – which

15

it was not – Defendant has no right to defame and vilify Plaintiff as a Russian stooge, and, thereby, impugn and injure Plaintiff's Virginia business. The kind of professional attacks at the center of this case on an independent journalist by a large media organization doing the bidding of powerful politicians cannot be tolerated. Defendant's smears of a Virginia publication must be adjudicated in a Virginia court.

For the reasons stated above and at the hearing of this matter, Plaintiff respectfully requests the Court to deny Defendant's motion to dismiss.[9]

DATED: February 9, 2021

                THE CONSORTIUM FOR INDEPENDENT
                     JOURNALISM, INC.

By: */s/ Steven S. Biss*
     Steven S. Biss (VSB # 32972)
     300 West Main Street, Suite 102
     Charlottesville, Virginia 22903
     Telephone: (804) 501-8272
     Facsimile: (202) 318-4098
     Email: **stevenbiss@earthlink.net**

*Counsel for the Plaintiff*

---

[9] In its memorandum in support of motion, Defendant makes numerous impertinent and inaccurate statements. On page 1 of its memorandum, for instance, Defendant represents that "as even Plaintiff recognized when it previously retained Canadian counsel to press its claims in Canada under Canadian law, this is a dispute that should have been litigated, if at all, in a Canadian court." These untrue statements violate Rule 12(f) and should be struck by the Court.

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2021 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendant and all interested parties receiving notices via CM/ECF.

By: */s/ Steven S. Biss*
Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272
Facsimile: (202) 318-4098
Email: **stevenbiss@earthlink.net**

*Counsel for the Plaintiff*